2-3-5-4-9-7 United States of America versus Ayana Saunders. Arguments not to exceed 15 minutes per side. Mr. Brown for appellant. If I could, Your Honor, I would like to reserve three minutes of my time for rebuttal. Thank you. And good morning again, Your Honors. I am Mark Brown. I'm from Knoxville, Tennessee, and I'm representing Ms. Ayana Saunders in this appeal which originates out of the Western District of Tennessee. And we're respectfully asking this court this morning to reverse and remand her convictions in this case as she was convicted of conspiracy to commit fraud, basically being wire fraud and bank fraud and money laundering. This case was charged as a conspiracy, and as we all know from our experience with conspiracy, those are relatively easy to prove. All you have to do is show a conspiracy and a slight connection. But you do have to show a connection, and more importantly, you have to show an agreement. And that's what we assert is missing in this case, is there is no agreement. It's an absolute requirement for a conspiracy conviction to have that agreement. And we all know absolutely from the case law and the jury instructions that merely associating with members of a conspiracy or even doing something to help a conspiracy does not make you a co-conspirator. And in this case, the proof at trial presented nothing more than an association with co-conspirators and an opportunity, or not an opportunity, but helping a conspiracy along. Because there's no dispute here, none at all, that some money passed through Ms. Saunders' account. Why isn't that enough to show participation in a conspiracy? It would not be enough because that's all we have. We don't have anything else other than money going into her account and then going back out to Nigeria. And it happened very quickly, repeatedly, with some of the same players again and again, including her husband. It did. And that's one of the major points here, is it was her husband. Think about it in these terms. I was thinking through this last night. In a typical chain conspiracy, which happens most of the time, let's be honest, with drug cases, someone's passing along drugs, you're paying them down the line. In this case, and you may not know if you're the fourth person down the line, that the first person is the one that originated the drugs back here. But in this particular instance, Ms. Saunders is just getting directions from her husband on what to do with the money. So yes, I agree, it's happening very quickly and it's coming along at relative in time to the time it's coming in. But she was receiving instructions from her husband that said, keep a small percentage, send the rest to me in Nigeria. Now, is it possible that in Nigeria her husband, Mr. Arati, and other people in Nigeria are working a scam behind the scenes and he's using her bank account in the United States for the purposes of that scam? Is it possible? Absolutely. It's probably likely. But that's not something she would know because the communication wasn't always there. It was just the communication was, here's what's coming in, money she thought he was raising for a movie project in Nigeria, the money's coming in here. Does it matter where the money is coming from? Meaning? Well, I mean, here she is and, boy, pennies from heaven on a regular basis. Correct. There aren't any logical, legitimate inferences that might be drawn from that? There would be, I understand Your Honor's point, there would be in this instance. I would think that, let's think, for example, if random money is just showing up in your account. If somebody puts $35,000 in my account today and tells me to move it on somewhere else, then I think it's pretty clear at that point that I should know, common sense wise, that something's going on. But in this case, all she knew was what her husband was telling her to do. She wasn't, there's no dispute here. She didn't know any of these other people. And I understand, in conspiracy, you don't have to know everybody. I get that. But she didn't know any of these people. She did not direct anybody ever to put money into her account. The only directions she ever received were from her husband. And he was telling her, keep a percentage, move it on. Why isn't that just a jury question, to decide whether she's believable, whether the evidence is believable, including a jury question, was there an agreement? And typically, yes, yeah, I understand. It is a jury question. But this is also subject to a de novo standard of review where your honors can look at the record and say, and look at it and say, is there really an agreement here? So are you saying that there's simply insufficient evidence to support the idea of an agreement? I am. And if you are, why isn't the standard on that, would any reasonable juror have concluded that there is evidence to support the conspiracy? And that is the standard. But your standard of review gives you the opportunity to take a step back and say, could a rational juror have determined that she had an agreement with these people in order to commit bank fraud, wire fraud? It allows you to step back and review that. What was her theory as to why she was keeping 10% of each payment that went through? Her theory at trial, and this is from her testimony, is that it was part of the movie project and as part of the movie project, she was entitled to, quote unquote, a per diem per day for whatever work she was doing on the movie project. And what was she doing on the movie project, other than funneling these funds? I think she was sort of the creative force behind it. She went to film school, so she was the creative force behind it. I think she was kind of trying to set up. Didn't the jury have the right to listen to her testimony and say, no? They did. They did. And that's an issue. One logical, rational juror listened to her testimony and said, no, all this money arriving in my account, 10% of, to send to Nigeria. No, we don't believe that. I don't believe that. One juror. That's all that had to happen here. Correct. I mean, from our point of view. And you, and I think it's probably probably reasonable to assume that the jurors didn't necessarily believe her testimony at trial, because she did testify in her own defense. That's a decision she had to make and her counsel had to make. That's probably a reasonable conclusion. But even setting that aside, you still have to determine where do all the parts and pieces fit here? And that's, it's kind of a jumbled mess. You need a scorecard to keep track of all these. What are you saying additionally had to be proved by the government for a sufficient evidence to convict? Yeah, and I think, you know, it's just one isolated, and not isolated is not a really good word, but you've got the instance basically where only her account is being used for these purposes. We're never shown a connection between her and anybody else other than her husband with anything other than the account. Was there any evidence of the account being used for anything else besides these payments and withdrawals? It was a business account. I'm not aware of that. I don't know that that's in the record, but I'm not aware of it in reviewing it. I didn't see that. But that's the only thing. And in their own briefing, the government has characterized her as a money mule. And yes, a money mule. They used the testimony of an FBI special agent, Marcus Vance, who said that basically, yeah, a money mule, and I can quote it here. He says, so a mule has to knowingly join and be part of the conspiracy because they know the money's coming in, and they're going to pass it on as instructions. And I get what he's saying there. I understand that theory behind it. It's not a hard and fast rule, but in this case, you know, she was instructed by her husband to do these things, and that's the only instructions that she ever received. And from the account statement, it was not possible. Well, I take it to identify who the people were that were putting money into her account? I think, excuse me, Your Honor, I didn't mean to interrupt. No, I'm just asking, I've asked my question. No, there are notations on the bank statements where the money came from. Her understanding was that her husband, Mr. Arati, is doing the fundraising and getting the finances. She thought these were investors that were putting money in. Correct. That's all she thought they were. But you began by saying there's no evidence of an agreement, and that the agreement is the key in a conspiracy case. So are you saying, then, as a matter of law, that there has to be some evidence that she agreed to participate in a conspiracy? And if so, what's your best case for saying that? She doesn't have to have... There has to be a connection, obviously, in a conspiracy. But I thought your key point was that there's no agreement here. Correct. There's no agreement in... And you need to have evidence of an agreement. And I'm asking, what case would you point us to to say that, and to show that there's not enough evidence here? Well, I would point you to the Bostic case I cited in my brief, which talks about an association. It talks about being associated with people. And just because you're associated... And there's no doubt she's associated, at least with her husband here. Association's not an issue. She was associated. And just because you're doing that, I hope it doesn't mean that you're necessarily part of a conspiracy in order to commit these acts. So you need to have some kind of an agreement, you're saying. And the agreement, I assume, could be oral or written. And what kind of proof would the government have to show, then, in the case law that would show that kind of an agreement that you're saying is missing here? Yeah. I think what they'd have to show is something more than what they showed. And that's simply that money went into her account and went out quickly. I think they're asking the jurors... They did ask the jurors to make an inference that because your husband told you to keep a portion and send it on, that that was, in fact, an agreement. And if I could quickly, just because I know our time's running out and I saved some time for rebuttal, the other two issues we raised in our brief, the venue issue, and venue sits out there, and then the constructive amendment or variance. The variance goes to all these different kind of things we've got going on. We've got all these different conspiracies and people defrauding people, and they don't all involve Ms. Saunders, and she wasn't the last domestic stop all the time for money. I see my time's up. Thank you. Good morning, Your Honors. May it please the Court, my name is Rainey Irwin, and I represent the United States in this matter. Sitting at the Council table with me is my colleague, Mary Mars. Saunders presents three issues for this Court's consideration. Sufficiency of the evidence, constructive amendments or variance from the indictment, and venue on the money laundering conspiracy count. Starting with sufficiency of the evidence, Saunders argues that the evidence was insufficient to prove that she participated in a conspiracy to commit wire fraud and conspiracy to commit money laundering. And I would like to start off by showing the Court some examples of what the jury heard that clearly show the evidence was sufficient to sustain those convictions. Saunders cannot show in this case that no rational juror could find her guilty. Saunders accepted tens of thousands, hundreds of thousands of dollars flowing through her account from perfect strangers. And each and every single time, she engaged in money mule behavior by chopping that money into multiple amounts and sending it out to Nigeria. And that's after keeping a cut. Additionally, she sent it to her husband. So why isn't this just showing that she was and she had this film idea that they were going to produce this film. So where's the, your opponents really focused in on an agreement. Is there an agreement here to conspire to commit money laundering or any kind of fraud? Absolutely, Your Honor. While she might not have actually used the magic words, this is an agreement to commit a conspiracy here to send this money to Nigeria, her conduct, her behavior clearly showed that layering money by taking money that was wired to her, transferring it to another account that she controlled, each time taking a cut along the way and then sending that money out to Nigeria to her husband's account. Additionally, Your Honor, there was proof at trial that Mr. Arade had an account at Citibank in the United States. If in fact he was the one who was supposed to be controlling the money, he was the finance person, the money could have just been sent to his account. So what is the best case, I was asking the same question to your opponent, what's the best case to show that this kind of action, which you characterize as a money mule, constitutes an agreement, even if you don't have some written agreement, which really would be totally unlikely that conspirators would say, yes, I agree, I'm going to be a money mule for you. I think that Aaron's case speaks to that. Again, while there doesn't have to be a formal contract, participation in the transferring, receiving the funds and then transferring those monies out to Nigeria was sufficient. And I'll add that there was a lot more to it because Sandra said she was the creative part of this movie that she said she was making. However, she's the one receiving hundreds of thousands of dollars in her account. She said she didn't handle the finances of the movie and that the budget for the movie was $28,000. Yet Sandra's received more than 10 times that amount through her account and she was each time taking a cut of the money similar to Martin Hatton, the co-defendant, similar to Cranford, the co-defendant, all of them were taking a cut of the money and sending it along the way so that it would end up in Nigeria. Saunders was the last domestic stop with regard to the money that she sent because she knew she had an American sounding name and that would be enough to convince these victims to send their money to Saunders because, as Cranford testified, one of the individuals, he told them that Saunders was the CFO of the lending company and that was sufficient for the victim to think this was a legitimate enterprise, this was a legitimate business and he sent his money directly to Saunders who then took a cut of it, chopped it up and sent it straight to Nigeria, to Arate's account in Nigeria. On another point which was in the briefs and your opponent mentioned it briefly, the venue question. My understanding is that she had no connection with Tennessee whatsoever, am I correct about that? That's correct, your honor. So why does the district court in Tennessee have venue? Because this was a conspiracy and when you're involved in a conspiracy, you're on the hook for whatever conduct your co-conspirators might do. In this case, Cranford received Allison Haynes' money. Allison Haynes was a resident of Memphis, Tennessee who was attempting to purchase a house and her $76,000 approximately $76,000 down payment was intercepted through a business email compromise on her real estate agents as well as the title loan or closing agents for her real estate transaction. That money was received by Cranford who then sent that money, parceled it out some to Martin Hatton, the co-defendant who then chopped it up and sent the money to Nigeria as well as another unknown co-conspirator or a known co-conspirator who sent the money on to Nigeria. Also on that same day... Did she get any of that money that the woman victim in Tennessee sent out? She did not, but that's not what's required. What I was also going to point out was that on that same day May 26, 2017, Cranford the same day he received Allison Haynes' $76,000, he also sent $8,000 to Saunders. Not necessarily from that same pot but as money mules, they often had multiple bank accounts. Saunders had multiple bank accounts, Cranford had multiple bank accounts. Cranford would send money from these different accounts to Saunders and also to Nigeria. Even though Allison Haynes' specific $76,000 might not have gone to Saunders it was still indicative of the same network of co-conspirators and the same type of victimization that was going on in defrauding these victims of their money. It was romance scams, it was real estate scams, and loan scams. Was Cranford a co-defendant in the Western District of Tennessee? Yes, Your Honor, and Cranford pled guilty. He testified in front of the jury. He owned up to his responsibility. He owned up to what he did with regard to being a money mule and sending the money to Saunders as well as straight on to Arate in Nigeria as well as the money he sent to Martin Hatton who sent the money to Nigeria. If it had been, say, a nationwide effort to get money from people in every one of the 50 states, you could have brought the action in Alaska? That's correct, Your Honor, yes. Additionally, Your Honor, there were 12 victims who testified with regard to this case and every last one of them stated that they would not have sent money to Nigeria had they known that that's what was going on. They would not have invested in a movie, this movie that Saunders claimed that she was making. Saunders claimed that this movie had won awards. However, none of these alleged or so-called investors received any kind of return or any repayment of the money that Saunders claimed she believed they were investing in the case. Did they actually make a movie? They did play a trailer for the jury. I think it was a couple of minutes long. I'll leave it at that. Additionally, Your Honors, Was the movie made in Nigeria? I couldn't say for sure. It did appear to be. I mean, the trailer had actors from Nigeria. That part's correct. I mean, well, they had an accent. I can't say where they were from. Yes, Your Honor. I would also state that Saunders deleted multiple emails that were in her account that were specifically related to the wire transfers that she was receiving from the victims. In the reference column for these wire transfers, they would say loan origination fee and a good faith deposit. You know, references that are typically known to be regarding a real estate transaction or some kind of loan that you're expecting to receive. Saunders then, in turn, when she would send the money to Arate in Nigeria, she would change the reference line to say marrying a Campbell movie P.O.P. crew fees. I mean, if you believe that this money is specifically from these investors, all these real estate companies are investing in your movie, why are you changing the reference section? That didn't make any sense, and I think the jury discredited her testimony with respect to all of that. What about the clean up episode after she was contacted by the FBI? Yes, Your Honor. Detective Larson on behalf of the FBI went out and interviewed Ms. Saunders and Mr. Arate to put them on notice that there was a fraud investigation going on. They basically claimed not to know anything about it. He came back a couple of days later with money mule letters to present to them from the FBI. But what happened during that time span from the first day that he showed up, which I think was on the 10th to when he returned on the 12th Saunders had taken a $5,500 check that she received from Donna Lambeth in the mail, one of the victims. She took that check to her bank, she deposited the $5,500 check. The very next day she goes back to her bank and she withdraws that same $5,500, and we know it was the same money because she had no money in that bank account, as was testified to by the FBI forensic accountant, Tanya Tompkins. Saunders goes back the next day, withdraws that $5,500 in cash, and then within a few minutes, redeposits the $5,500 in cash. In the same account? In the same account. And of course the jury was surprised. That made no sense. What was the purpose of that? Saunders did that on more than one occasion. When she was testifying, did she talk about why she did these things? She did, and could not give a reasonable explanation to the jury. She initially denied signing the check, she said that wasn't her signature, and that she seemed to indicate that maybe someone else somehow had gotten a hold of the check and deposited it into her account, which didn't make any sense. Then she backtracked I think a little while, maybe it was on Redirect, she ended up admitting that it was her signature. Then she tried to say that it was to purchase equipment or to buy a camera, and then after she said it was to buy a camera, she said this had nothing to do with the movie. It's strange behavior, but how is that circumstantial evidence of involvement in a conspiracy? What does that mean? Is that some sort of a tactic? I don't understand how it ties in. I think what it shows is that Saunders was not credible, and the jury is allowed to make that inference based on the testimony that she provided. It just was nonsensical. Again, Your Honor, the stolen money in Saunders' account was ten times more than what the cost of this movie, Marrying a Campbell, was supposed to be. Couldn't that show that this was just the beginning of a wonderful movie career for them? That they were going to have sequels, as everybody does these days? Perhaps, Your Honor, but I think what's significant about the fact that this movie only cost $28,000 to make, if in fact they made a movie, these victims never received any repayment of the monies, never received any kind of return on the monies, if in fact Saunders believed this to be an investment. Not only that, but the way you were describing the woman in Memphis, she wasn't investing in a movie. She was making a deposit on a house that she wanted to live in. That's correct, Your Honor. She got the shock of her life when she appeared to do the final walkthrough of the house that she was trying to buy and learned that her $76,000 disappeared completely. That's correct, Your Honor. Also, Your Honor, Saunders played a valuable role in this conspiracy specifically because she had an American sounding name and she was the last domestic stop in the United States before that money went to Nigeria. And your red light is on, so if you want to conclude. Yes, Your Honor. We would ask the court to affirm the jury verdict. We believe that the evidence was sufficient in this case for the jury to make the guilty verdict in this case on conspiracy to commit wire fraud and conspiracy to commit money laundering. Thank you. Thank you, Your Honor. It is my understanding to answer Your Honor's question that the movie was made and it was made in Nigeria. I've never seen it, so I don't know where it's going, but that's my understanding from her. You were not the lawyer at trial? I was not, Your Honor. No. Each one of them had their own retained counsel in the Western District of Tennessee. I was just appointed to do this case. A couple of things that I wanted to just follow up on on the government's argument. They mentioned about Mr. Arati had a Citibank account in the U.S. and he's in Nigeria. Why don't you just put the money in the Citibank account in the U.S.? I don't know if there's a Citibank branch in Lagos, Nigeria or anywhere in Nigeria. I don't know if they have ATM machines, so I don't know that that makes much of a difference. On the venue issue, I would like to point out in my remaining time here, and we put it in our briefing on page 53, that about venue is proper for prosecutions of money laundering conspiracy in the district where the substantive money laundering would lie, or in any other district where an act in furtherance of the conspiracy took place. And then it follows along, for substantive money laundering, the money laundering statute permits venue in any district where a prosecution for the underlying specified unlawful activity could be brought if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that unlawful activity is conducted. And by their own admission up here in their argument, Jeffrey Cranford did transfer some money to Iona Saunders, but they can't tell you for certain that that money was from this Allison Hames real estate transaction. He did transfer it, but do we know the origination? And what didn't originate from the only contact in this entire case with Ms. Saunders in the Western District of Tennessee is supposedly a wire transfer that went to Mr. Cranford. Was it simultaneous or immediately after the money went from Tennessee to Cranford? I don't know that we know that from this record to be honest with you, Your Honor. I don't know if that piece is there to put that together. I just know I heard an admission that they don't know that that money was money from this scheme. Yeah, but money is fungible. So if the woman in Tennessee sent the money to Cranford and Cranford then sent money out of his own checking account to Ms. Saunders and the amount was less than or so Cranford could have taken a cut I don't know if this will prove Venue is not correct. Well, and all I would point to is what I just cited to you from United States v. Myers and that is that we seem to need, that we have to have some proof that that's where it originated for that venue to be proper. So we would ask respectfully that you reverse your convictions remand for either judgment of acquittal or a new trial. Thank you for your time this morning. Thank you and thank you. I see you're appointed and you mentioned it pursuant to the Criminal Justice Act and we thank you for your service to your client and to the service of justice. Thank you.